# Pennsylvania Railroad Company v. P. Bannon Pipe Company.

(Decided February 23, 1926.)

## Appeal from Jefferson Circuit Court (Common Pleas Branch, First Division).

1. Railroads—Evidence Held to Sustain Recovery for Damages from Fire Caused by Sparks.—In action against railroad company for damages because of fire destroying buildings, evidence that hot sparks had been thrown from engine, and that fire had broken out shortly after passing of engine, held sufficient to sustain verdict for plaintiff.

2. Railroads—Whether Screen of Locomotive Emitting Sparks was in Good Condition Held Properly Submitted to Jury.—In action against railroad company for damages from fire, submitting issue whether screen was in good condition held proper, notwithstanding uncontradicted evidence that screen was of standard make and in good condition, where there was also evidence that sparks of unusual size were emitted from locomotive.

3. Evidence—Hypothetical Question Submitted to Engineer as to Emission of Sparks Held Warranted by Evidence.—Hypothetical question to experienced engineer as to effect handling of engine so as to cause rapid puffing would have on discharge of cinders through screen held warranted by evidence.

HUMPHREY, CRAWFORD & MIDDLETON for appellant.

MATT O'DOHERTY, WALTER P. LINCOLN and BERNARD O. KEARNEY for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

In the court below the P. Bannon Pipe Company recovered a judgment against the Pennsylvania Railroad Company in the sum of $27,748.00 in damages for the destruction of a portion of its plant by fire alleged to have been caused by the negligence of the railroad company. The railroad company appeals and as grounds for reversal urges: (1) That the verdict was flagrantly against the evidence; (2) error in instructions; (3) admission of incompetent evidence.

The facts are: The Pennsylvania Railroad tracks in the city of Louisville run south of 14th street, intersecting with Maple, Breckinridge, Garland and Kentucky streets and into the I. C. Railroad yards, south of Kentucky street. It has a switch south of Breckinridge

street intersection, at which trains are routed through the yards. Going south there is an up grade of practically one per cent to a point a short distance south of the switch, and a slight down grade from there on. In addition to a plant and other buildings in that vicinity, the P. Bannon Pipe Company had a storage shed, coal bins, stable, and garage in a square bounded on the north by Breckinridge, east by 13th, south by Garland and west by 14th street. This consisted for the most part of an open shed running from the intersection of 14th and Breckinridge east about 100 feet; thence south 200 feet; thence west to 14th; thence up 14th street to the beginning. It was built of cedar posts, pine joists and sheathing and covered with paper roofing, surfaced with tar, the shed proper being fenced, but not otherwise enclosed. The eastern side of the shed was about 20 feet high, but the roof sloped and the western side was only about ten feet in height. The coal bins began at Breckinridge and entended south on 14th street — feet. To the east of this on Breckinridge was an entrance to the shed, a garage and a stable for two mules. There were also about four or five cars of lumber stored in this part of the building to be used for crating. Otherwise the shed was used for storing pipe.

It appears that on the day before the fire the roof had been repaired in a number of places by spreading fresh tar upon it. On a sunny Sunday afternoon, June 3, 1923, a crew of appellant company were engaged in transferring four cars to the I. C. R. R. Company yards, using a large engine for that purpose. The engine was backing and shoving the cars which were south of the tender. It stopped north of the switch with some of the cars beyond the apex of the grade. According to the evidence of plaintiff its watchman had just completed a thorough inspection, both inside and outside the shed, and had found everything in good condition. He came out of the shed on the 14th street side as the train started from the switch. While in the shed he heard loud and violent puffing, and after coming out, started north across Breckinridge street and met the train, the engine of which was emitting great volumes of smoke and large cinders, some of which fell upon him and burned holes through his hat and shirt. At that time the wind was blowing from the southwest. The noise of the train attracted the attention of a number of people, and after a

short interval, several small fires accompanied by a yellowish smoke were observed about the center of the roof of the shed.    A fire alarm was turned in and the department responded promptly but by the time of its arrival the fire was beyond control.    The shed was destroyed by the fire and water damaged the pipe to such an extent as to practically destroy its value.

Two witnesses testify as to the character of the sparks emitted, the watchman's description being: "Just before I got out of the shed I discovered, heard the train come up the track, coming out south just puffing to beat the world, puff, puff, puff, pu—ff, pu—ff, p-u—f-f, and I walked on out and got on Breckinridge; and the train was below the watch house, the engine had stopped there for a minute or two."    Q.    "It stopped?"    A.    "Well, I think it had; if it had not come mighty slow, and when they started up again why this here loud exhaust—black smoke and the fire just flew from the smokestack and it come on up and passed me, it just throwed fire all over my hat—on my arms and burned a hole in my shirt sleeve and also there were some three or four holes burned in my hat, in the crown here and on the brim—"    A.    "Was it then that you got those sparks?"    A.    "It was indeed, black smoke and the fire just flew everywhere; they were bigger than common sparks, they were a good deal bigger than common sparks would be."    The hat was also produced in evidence.    Henry Jones states that he was firing a kiln at 14th and Breckinridge streets, "and the train was making so much noise, coming up, backing up, pulling so hard, was the first to attract my attention, and I seen it throwing out sparks, every time the wheel turned over, you know, it would throw a lot of sparks out it was pushing so hard."    There was also evidence by a locomotive engineer that a tarred roof would ignite under the conditions described.

The defendant's evidence is that there is a tower at Fourteenth and Maple streets, at which a record is kept of the movements of trains, and by this record it is shown that the train in question passed that place at 3:47.    The engine was a heavy one and was shoving only four cars, a light cut; it stopped for the switch to be thrown near the Bannon property, after which it moved on, going very slowly; the grade is slight and no extra exhaust was required or made in starting or in the further movements of the train.    There are several switch tracks; the crew picked up two cars on one

of these and returned for a short distance and shoved them on another track and uncoupled the engine, the entire movements not consuming more than eight minutes. No fire was visible in the Bannon plant as they passed, but after the switching movement was completed the conductor returned to the tower at Kentucky street to get orders and discovered the entire Bannon plant in flames. The first alarm was turned in between 3:50 and 3:55, or less than eight minutes after the engine had passed the block at Fourteenth and Maple streets, and even a shorter time after it had passed the Bannon property; the fire department arrived within three minutes after the alarm was turned in, and at that time fire was coming out of the doors on the Breckenridge side and the entire interior filled with smoke. One witness observed smoke coming from the center of the roof, a section of which raised to a height of eight or ten inches, sank back and the flames burst forth. The engine was equipped with a standard screen, with wire mesh; it was examined on the 3rd of April and again on the evening after the fire and found to be in good condition at both times, and a similar screen was introduced in evidence.

Prof. Gilbert A. Young, of Purdue University, testified to a series of tests made by him during a number of years with passing locomotives to ascertain under what conditions a fire may be started from cinders emitted through screens with various meshes. He was also given a piece of roofing said to come from this plant and stated that he was familiar with that type of roofing and that in his opinion it could not have been ignited as claimed, and that it was not reasonably possible for cinders from a standard mesh to set fire to a three-ply composition roof covered with tar at a distance of 100 feet from the railroad track.

From this it is argued (1) that the fire could not have been caused in the way claimed by plaintiff; (2) that if it had originated in this way it could not have gained the headway it did in so brief a time, and that therefore the verdict is flagrantly against the evidence and should be set aside, though it is admitted that under the scintilla rule, there was sufficient evidence to submit it to the jury. It is true that subsection 6, section 340 of the Civil Code, authorizes a new trial where the verdict is flagrantly against the evidence, and this court has frequently set aside verdicts for that reason. However, we are not convinced that the rule should be applied to

the facts of this case. While appellant's evidence in this particular is entitled to consideration, it is not conclusive. The watchman saw no evidence of fire on his inspection, and defendant's agents in charge of the train saw no fire in the shed as they passed, although they looked in that direction. A southwest wind was blowing and if a fire had existed in the shed, it is likely the smoke would have been carried beyond its edges, yet no one saw such. The roof had been freshly tarred and on a sunny June afternoon there is a probability that fresh tar could have been ignited in this way. A number of witnesses, including one introduced by defendant, testify that they first saw the fire on the roof, accompanied by yellowish smoke. This is strongly persuasive of burning tar. They further testify that there were several of these fires in close proximity. There was no occasion for a fire occurring in the shed on Sunday. It apparently broke out over that part of the shed in which the pipe was stored, which would rather negative the idea of a fire below, and the only evidence of its probable cause is that of the witnesses who testify as to the violent exhaust of the engine and the size of the sparks. Certainly this afforded sufficient evidence to sustain the verdict of the jury.

(2) It is insisted that it is shown by uncontradicted evidence that the screen was of standard make and in good condition and that the court erred in submitting an issue as to its condition to the jury. However, on the other hand it is proven that sparks of unusual size were emitted from the locomotive and plainly observable in the afternoon sunlight, and that such sparks may be so seen when at white heat. If this evidence is true the sparks were emitted either by reason of the screen not being in proper condition or by reason of the negligent operation of the engine, and as appellant's evidence contradicted the theory of negligence in each respect an issue was raised as to both which was properly submitted to the jury under separate instructions. I. C. C. R. R. v. Nuckols, 212 Ky. 564.

(3) John Flynn, an engineer of 20 years' experience, was asked by plaintiff; "What effect has the proper handling of an engine, say the engine is stopped and switched and the engineer started it back pushing four cars up grade, and the engine is heard to go puff, puff, puff, very rapidly, that rapid movement, what effect will that have upon discharging cinders through the screen?"

A. "That would emit fire much more severely than the ordinary practice. That will force, well to make it plainer, an engine used that way is called slipping, slipping the engine; that is caused by the wheels of the engine turning rapidly on the rail without the proper adhesion to the rail—too much steam having—in case of that kind that will force the coal and the sparks, and in some cases they break through the netting, making what you call a longer spark . . . and that I think would hold fire long enough to burn anything it lit on."

It is insisted that the above hypothetical question was not based on the proven facts and was therefore incompetent. However, a reference to the evidence of the watchman and Jones will show that the question is directly in line with the description of the movements of the engine, hence the criticism is inapt.

Wherefore, perceiving no error, the judgment is affirmed.